AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 20-sw-238 |
| THE PREMISES LOCATED AT 1331 NEAL STREET NORTHEAST WASHINGTON, D.C. 20002 UNDER RULE 41 | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A incorporated herein.

located in the _____ District of _____ Columbia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C § 2251(a), 2251(e) | Sexual Exploitation and attempted sexual exploitation of minors |
| 18 U.S.C § 2252(a)(2), 2252(b)(1) | Knowing distribution and receipt and attempted distribution and receipt of child pornography |
| 18 U.S.C § 2423(c) | Engaging in illicit sexual conduct in foreign places |
| 18 U.S.C § 1956(a)(2)(A) | Laundering of monetary instruments |

The application is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Raymond Abruzzese, Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means).*

Date: _____ 10/05/2020 _____

_____
*Judge's signature*

City and state:  Washington, D.C.

Magistrate Judge G. Michael Harvey
_____
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means    ☑ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | | |
|---|---|---|
| In the Matter of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.  20-sw-238 |
| THE PREMISES LOCATED AT 1331 NEAL | ) | |
| STREET NORTHEAST WASHINGTON, D.C. | ) | |
| 20002 UNDER RULE 41 | ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____ Columbia
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A incorporated herein.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B incorporated herein.

**YOU ARE COMMANDED** to execute this warrant on or before _____ 10/19/2020 _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Magistrate Judge G. Michael Harvey _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____ 10/05/2020 _____        _____
*Judge's signature*

City and state:  Washington, D.C. _____        _____ Magistrate Judge G. Michael Harvey _____
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  20-sw-238 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**

**DESCRIPTION OF LOCATIONS TO BE SEARCHED**

The entire property located at 1331 Neal Street NE Washington, DC 20002, including the residential property and any storage units found on the curtilage of the property. Any vehicles registered to the occupants of the Subject Premises that are located on the curtilage of the Subject Premises. The Subject Premises is further described as a two-story red brick residential property with a white awning on the front side. The numbers "1331" are displayed on the front of the white awning. Below is an image of the Subject Premises that this warrant is sought for:



51

## ATTACHMENT B

*Property to be seized*

1.   The items to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of Title 18, United States Code, Sections 2251(a) and (e), 2252(a)(2), 2423(c) and 1956(a)(2)(A)**,** as described in the search warrant affidavit, including, but not limited to:

a.   Records and information relating to the Sexual Exploitation of Children; the Receipt and Distribution of Child Pornography; Travel in Foreign Commerce and Engaging in Illicit Sexual Conduct; and the Laundering of Monetary Instruments.

b.   Child pornography, child erotica, and any photographs of minors in various states of undress.

c.   Photographs that depict BAYNES in the Philippines.

d.   Any photographs that depict minors in the Philippines.

e.   Any United States Passports, Birth Certificate or other official documents that show that BAYNES is United States Citizen.

f.   Any records, documents, tickets, communications, booking confirmations, receipts, luggage stickers and/or tags that show BAYNES travel between the United States and the Philippines.

g.   Any and all financial records, documents, and receipts, in any form, that show the movement of money between the United States and the Philippines.

h.   Records and information relating to the email accounts and social media accounts used by BAYNES.

i.   Records and information relating to the identity or location of perpetrators, aiders and abettors, coconspirators, and accessories after the fact.

j.   Records and information relating to the identity or location of minors who BAYNES was communicating with, or attempting to communicate with, using the Internet and social media accounts.

k.   Records and information relating to communications with Internet Protocol address 69.250.207.97.

l.   Records and information relating to malicious software or the lack thereof.

m.   Records and information that constitute evidence of use, control, ownership, or occupancy of the PREMISES and things therein.

n.   Records and information that constitute evidence of the state of mind of BAYNES *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation.

o.   Records and information that constitute evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with BAYNES about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts.

2.    Digital devices used in the commission of, or to facilitate, the above described offenses, including Title 18 United States Code Sections 2251(a) and (e), the Sexual Exploitation and the Attempted Sexual Exploitation of Minors, Title 18 U.S.C. Sections 2252(a)(2) and (b)(1), the knowing distribution and receipt and attempted distribution and receipt of child pornography,

Title 18, United States Code, Section 2423(c), engaging in illicit sexual conduct in foreign places, and Title 18, United States Code, Section 1956(a)(2)(A), the Laundering of Monetary Instruments.

3.      For any digital device which is capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities as described in the search warrant affidavit and above, hereinafter the "Device(s)":

    a.  evidence of who used, owned, or controlled the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

    b.  evidence of software, or the lack thereof, that would allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c.  evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

    d.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

    e.  evidence of the times the Device(s) was used;

    f.  passwords, encryption keys, and other access devices that may be necessary to access the Device(s);

    g.   documentation and manuals that may be necessary to access the Device(s) or to conduct a forensic examination of the Device(s);

    h.   records of or information about Internet Protocol addresses used by the Device(s);

    i.   records of or information about the Device(s)'s Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

4.    Routers, modems, and network equipment used to connect computers to the Internet.  During the execution of the search of the PREMISES described in Attachment A, law enforcement personnel are also specifically authorized to obtain from BAYNES (but not any other individuals present at the PREMISES at the time of execution of the warrant) the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint, facial characteristics, or iris display) necessary to unlock any Device(s) requiring such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the aforementioned person(s)' physical biometric characteristics will unlock the Device(s), to include pressing fingers or thumbs against and/or putting a face before the sensor, or any other security feature requiring biometric recognition of:

    (a)   any of the Device(s) found at the PREMISES,

    (b)   where the Device(s) are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments,

for the purpose of attempting to unlock the Device(s)'s security features in order to search the contents as authorized by this warrant.

While attempting to unlock the device by use of the compelled display of biometric characteristics pursuant to this warrant, law enforcement is not authorized to demand that the aforementioned person(s) state or otherwise provide the password or identify the specific biometric characteristics (including the unique finger(s) or other physical features), that may be used to unlock or access the Device(s).  Nor does the warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel the aforementioned person(s) to state or otherwise provide that information.  However, the voluntary disclosure of such information by the aforementioned person(s) is permitted.  To avoid confusion on that point, if agents in executing the warrant ask any of the aforementioned person(s) for the password to any Device(s), or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks any Device(s), the agents will not state or otherwise imply that the warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital devices" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); security devices; and any other type of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

IN THE MATTER OF THE SEARCH OF:   )
                                      )     **SW No. 20-sw-238**
THE PREMISES LOCATED AT         )
1331 NEAL STREET NORTHEAST    )
WASHINGTON, D.C. 20002        )
UNDER RULE 41                   )

*Reference:    USAO Ref. # 2020R00862 Subject Residence: 1331 Neal Street NE, Washington, DC 20002*

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Raymond Abruzzese, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 1331 Neal Street Northeast, Washington, DC 20002, hereinafter the "Subject Premises," further described in Attachment A, for the things described in Attachment B.

2.      I have been employed as a Special Agent of the U.S. Department of Homeland Security, Homeland Security Investigations ("HSI") since in or around March 2003 and I am currently assigned to the Child Exploitation Unit in Dulles, Virginia.  While employed by HSI, I have investigated federal criminal violations related to high technology or cybercrime, child exploitation, and child pornography, as well as commercial fraud and immigration fraud.  I have gained experience through everyday work relating to conducting these types of investigations.  I also have received training in the area of child pornography and child exploitation and have had

1

the opportunity to observe and review numerous examples of child pornography (as defined in

18 U.S.C. § 2256(8)) including computer media.  Due to my experience and training, I can

identify child pornography when I see it.  Moreover, I am a federal law enforcement officer who

enforces federal criminal laws, including 18 U.S.C. §§ 2251(a) and 2252(a)(2), and I am

authorized by law to request a search warrant.

3.      The facts in this affidavit come from my personal observations, my training and

experience, and information obtained from other agents, witnesses, and agencies.  This affidavit

is intended to show merely that there is sufficient probable cause for the requested warrant.  It

does not set forth all my knowledge, or the knowledge of others, about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, I

respectfully submit that there is probable cause to believe that evidence of violations of Title 18

United States Code Sections 2251(a) and (e), the Sexual Exploitation and the Attempted Sexual

Exploitation of Minors, Title 18 U.S.C. Sections 2252(a)(2) and (b)(1), the knowing distribution

and receipt and attempted distribution and receipt of child pornography, Title 18, United States

Code, Section 2423(c), engaging in illicit sexual conduct in foreign places, and Title 18, United

States Code, Section 1956(a)(2)(A), the Laundering of Monetary Instruments, will be located

within the Subject Premises.

## PROBABLE CAUSE TO SUPPORT REQUESTED SEARCH WARRANT

5.      On or about April 8, 2020, HSI received information from the National Center for

Missing and Exploited Children ("NCMEC").  Facebook contacted NCMEC to report a Facebook

user(s) who appeared to be using Facebook accounts to contact and solicit minor females, believed

to be living in the Philippines.  Based upon a review of various Facebook chats reported by

Facebook to NCMEC, it appears that this individual was attempting to meet minors online, and to engage in illicit sexual conduct.  Facebook also reported that the subject(s) using these Facebook accounts was attempting to get the minors to take nude pictures of themselves and send them to the user.

6.     Neither NCMEC nor HSI requested Facebook to conduct a review of their databases for this information.  Facebook voluntarily provided this information in an attempt to report suspected criminal activity occurring on their social media platform.  The information provided by Facebook to NCMEC included information linked to the reported Facebook accounts and information linked to accounts believed to be used by minor females.

7.     For example, Facebook provided information about the following accounts: 100041137382232,  100024361086283,  100013153653859  and  100023380517229.  Facebook indicated these accounts were all linked to the same user via cookies.[1]   Based upon this information, and additional investigative steps detailed below, your affiant has identified Rennie

---

[1] According to Facebook Policy: Cookies are small pieces of text used to store information on web browsers. Cookies are used to store and receive identifiers and other information on computers, phones, and other devices. Other technologies, including data we store on your web browser or device, identifiers associated with your device, and other software, are used for similar purposes. In this policy, we refer to all of these technologies as "cookies."  Facebook can use cookies to link multilabel Facebook accounts to the same registered user or user accounts.

Valentine Baynes ("BAYNES") as the user of the reported accounts.  BAYNES is a United States Citizen and a resident of the District of Columbia.

8.     The following are chat excerpts from accounts believed to belong to a minor, who resides in the Philippines, and accounts utilized by BAYNES.  When registering these accounts, the minor provided Facebook the date of birth XX/XX/2003.[2]   Based on the fact that the minor provided a date of birth in 2003 when registering her account, coupled with the dates that the chats occurred and the content of some of these chats, there is reason to believe that the minor was between the ages of 15 years and 16 years old at the time she was communicating with BAYNES.  For example, in March of 2018, BAYNES and the minor female exchanged the following messages:

> BAYNES:   send me a nice pic of you….where is my sexy pic…..hot sexy pic
>
> BAYNES:  …you got a 6000k phone last "yea"….I got nothing
>
> Minor:   I want to send me 5k this coming Saturday please
>
> BAYNES: no
>
> Minor: What??
>
> BAYNES: not Saturday
>
> Minor: When??
>
> BAYNES:   i enjoy your body in person in april
>
> BAYNES: you not give your body to me stop asking for money

---

[2] This minor's name and date of birth are known to law enforcement.  This information will not be included in this Affidavit in order to protect the minor's dignity and privacy, and to protect the ongoing investigation.

Minor: Ok i gve you if you send me money this coming saturday…ok??

Minor: But you send me money ok??...This coming saturday

BAYNES: all your need is the code…the money been send

BAYNES: if you lie to me and not give me all your body….you never talk to me again you be poor for alife time

BAYNES: and never help you again if you not give al of your naked body yo me

BAYNES: but i can't give you 5000k again for nothing

9.    The following is an excerpt of a chat conversation provided by Facebook, which occurred in or about July 2019, that BAYNES, using Facebook, engaged in with the minor:

BAYNES:  look how sexy you dress from your pic…make you rich

Minor: Haha

BAYNES:  maybe your new bf taking good care of you now

Minor: I have no too

BAYNES: wish we can start over but you can see me in virac[3] soon again….you can meet me in a safe place

BAYNES: get me back in your life again

Minor: Am

BAYNES: this time is private

---

[3] Virac is the capital of the province of Catanduanes, Philippines.

10.     The following is an excerpt of a chat conversation, provided by Facebook, that

BAYNES engaged in on or about September 2019 with the minor:

BAYNES: Every month…Since may 2019

BAYNES: She got 25 k in cash

BAYNES: When we meet in may 21

Minor: ahhh

BAYNES: You could have the same but it have to be secret

Minor: ok

BAYNES: Jely give you the money…I send to her

Minor: when?....thank you

BAYNES: When we cool again..when you talk to her

BAYNES: When you add me back in your life

BAYNES:  Stop letting people used your phone

BAYNES: You in school

Minor:  yessss  Minor: HAHAHAHA: I have.no phone this is to my classmate…I

use..my phone broke last month

BAYNES: why shy to me only

Minor: i don't know

BAYNES: you never shy before you came to my house [4] last year you not shy

---

[4] Your affiant has reviewed numerous chats that BAYNES engaged in with other individuals where they discuss the fact that BAYNES owns a home in the Philippines.  To date, law enforcement has not determined the address of this home.

BAYNES: you plan to meet again

Minor:  its up to you…yesss

BAYNES: I have no problem meeting

Minor: I enjoy

Minor: I enjoy…yesss

Minor: i want to vc (video chat) with you…but I have no load

BAYNES: when jel get on line I get a load for you

BAYNES: i want to see you to on vc

BAYNES: you show me "ll" of you

BAYNES: at school or boarding house

Minor: house…at my friend

BAYNES: bf house or gf house

Minor: gf house

BAYNES: as cute as you….sexy as you…hot as you

Minor:  yesss

BAYNES:   show her pic…same your age

BAYNES:…tin tin banas told people i try to repe [5] you in 2017 you and regine but i

last saw regine in 2011 and i saw in 2015 how how i try to rape you in 2017

Minor:  noo..were not close tin tin why she make story like that?

---

[5] During Your affiant's review of this chat, your affiant concluded that when BAYNES uses the word "repe" he is referring to "rape".  This conclusion is based upon the context of the entire chat that transpired.

BAYNES: she owed me big money she can't pay it back so she lies so all her cousin be on her side

Minor: search Dani sxxx txxx cxxxx[6]

BAYNES: she is cute..same your age

BAYNES: nice play toy for you

BAYNES: you play with her yet

Minor: yuppp

BAYNES: taste good

11.     The following is an excerpt of a chat conversation provided by Facebook to NCMEC, which occurred in or about October 2019, between BAYNES and a minor female:

BAYNES: It be nice to see you again

Minor: nice nice

BAYNES: how do i get to see all of you is nice

Minor: hhuh?

BAYNES: how do i get to see all of you is nice

Minor: i don't know

BAYNES:   find a way

Minor: okk

BAYNES: or wait till jel come back in noe

---

[6] Your affiant has searched Facebook and found a user profile with this name.  This user also resides in the Philippines, has a youthful face that appears to be younger than 18, and wears a school uniform in various pictures posted on her Facebook account.

BAYNES: or send me your new pic sexy new pic

Minor: i have no…i have no phone

BAYNES: make plan to her to spend a day or night at kimj hotel room[7]

BAYNES: so you can have a fun time with her taking nice pic of fun with jel with new

phone

Minor: thank you thank you

BAYNES: make sure you do your part

Minor: thank you so much val

Minor…..Val 16 years old can claim money in cebuana?

BAYNES:  i do not know the law there i know over 18…you not 16

Minor:   In cebuana?

BAYNES:   where is that at

Minor:   virac

Minor:   Wait val I ask in cebuana….if 16 can get money

BAYNES:   you should have done that along time ago

12.     On or about April 30, 2020, the Honorable Federal Magistrate Judge Deborah

Robinson signed a warrant, authorizing the search of various Facebook accounts believed to be

used by BAYNES, including: Bayn Ren (100043514760006), Valentine Bay (1610705142) and

Valen Bayn (100005770035992).  Facebook provided content in response to the search warrant,

which  your  affiant  has  reviewed.   The  following  paragraphs  detail  various  communications

---

[7] Based on open source research, there is a Kemji Resort and Restaurant located on Airport Road
in Virac, Philippines.

between BAYNES, using one of his Facebook accounts, and individuals believed to be minors living in the Philippines.

13.     On or about December 30, 2019, and continuing through on or about February 26, 2020, BAYNES, using the Facebook account Bayn Ren, exchanged messages with Facebook user ID 100024867559722.  A portion of this exchange reads as follows:

Minor: ….I'm 16 □

Minor: …. i thought your not here in the Philippines

BAYNES: my house there

BAYNES: you underage with big money

14.     On or about November 12, 2019, and continuing through on or about December 3, 2019, BAYNES, using the Bayn Ren Facebook account, exchanged messages with Facebook user ID 100043537833193.  A portion of this conversation is included below:

BAYNES: you not scared to meet me

Minor: I'm scared too

BAYNES: You got all my info; so why you scared to meet me

BAYNES: I travel to far to get in trouble, I travel to enjoy myself and life

BAYNES: I can get in trouble in usa not in a foreign land

Minor:  (Sends BAYNES two images that depict a young looking female, wearing a red bra and a slip).

15.     On or about February 27, 2020, and continuing through on or about March 22, 2020, BAYNES, using the Facebook account Bayn Ren, exchanged messages with Facebook account Baby Lyn T. Tesorero (Facebook user ID 100047130874842). A portion of this Facebook chat conversation is as follows:

BAYNES:  she be 17

Tesorero: Who?

BAYNES: BXXXXXX BXXXXXXXX[8]

Tesorero: No. She's on 20

BAYNES: 16, I know we chat a lot

Tesorero: She told me she was a minor so you can't send it to her (referring to money)

BAYNES: She not of age you know that why you keep asking me why I send in

Tesorero: she going to use my name….you going to send 2500 right?

BAYNES: maybe I send 4k…..tell the agent am your uncle

Tesorero: Hmm. They so strict Val, So im scared

BAYNES: tell them if they ask am your uncle from usa

BAYNES:  (Sends an image that depicts his D.C. driver's license).

Tesorero: I just only give her 2500 like what you said

BAYNES: then she can take nice cool pic, she not shy

BAYNES: Cash at WU agent location 6

---

[8] Because BAYNES is describing a minor under the age of 18, her full name is being redacted to protect her dignity, safety, and privacy.  The investigation has revealed that this minor uses the Facebook account 100024867559722.

Tesorero: you send money but you want pic before you going to send money

BAYNES: I got the pic

BAYNES: It been a while since someone touch you let it be her

Tesorero: Who's her?

BAYNES: Who you pick up the money for, Stop acting stupid…..Spend time with her in your bed

16.     In April 2020, a Grand Jury subpoena was issued to Western Union.  In response to this subpoena, Western Union provided the following information:  On or about March 4, 2020, Valentine Baynes, using the address 1300 Neal Street NE Washington, DC[9] sent Babylyn T. Tesorero $80.00 Unites States currency via Western Union.  The Western Union location listed for the receiver of these funds is in the Philippines.  The transaction amount in Philippine currency is 3,978.80 pesos.

17.     On or about December 19, 2019, and continuing through on or about February 2, 2020, BAYNES, using the Facebook account Bayn Ren (with the assigned Facebook user ID 100043514760006) engaged in another chat with the same minor female, this time using the

---

[9] Information received from Western Union pursuant to legal process documents financial transactions transferred by Baynes to several individuals in the Philippines.  The addresses 1331 Neal Street NE Washington, DC (Subject residence) and 1300 Neal Street NE Washington, DC are both listed for a portion of Baynes' Western Union financial transactions.  The 1300 Neal Street NE Washington, DC is listed for the financial transaction discussed in this paragraph.  The credit card ending in "16405" is the only method of payment to finance Baynes' Western Union financial transactions.  This investigation has revealed that the credit card used by Baynes is issued by TD Bank.  Information provided by TD Bank pursuant to legal process, revealed that Baynes is the card holder for the referenced credit card account and the billing address is 1331 Neal Street NE Washington, DC.  A search of the District of Columbia Office of Tax and Revenue database revealed that there are no recorded properties associated with 1300 Neal Street NE Washington, DC.  It is unknown why Western Union lists 1300 Neal Street NE Washington, DC as associated with a portion of Baynes' financial transfers.  Your affiant submits for the reasons listed in this footnote and the information contained within this Affidavit, Baynes and the evidence sought by this search and seizure warrant will be located within 1331 Neal Street NE Washington, DC.

Facebook user ID  100041137382232.  According to records produced by Facebook, in response to the above-mentioned search warrant, the Account name DXXX RXXX listed the same date of birth:  XX/XX/2003.  The user of the account associated with Facebook identification 100041137382232 provided the telephone number +639365482804 when she created this account.  Facebook lists this telephone number in their records as "verified" which would indicate that the account user responded to Facebook confirming this telephone number in some fashion.  Images sent by the user of Facebook Identification 100041137382232 to BAYNES, some of which are described above, depict the same minor female in what appears to be a classroom.  Your affiant can see other young-looking individuals in some of these images sent to BAYNES.  Additionally, your affiant viewed the Facebook page associated with the minor female discussed in this paragraph.  The profile picture used by this Facebook user has a very young-looking face, appears to be small in stature, and appears to be under the age of 18.  A portion of Facebook chat conversation between BAYNES and this minor is as follows:

BAYNES: You having sex

Minor: No, I have no experience

BAYNES: I want you, as true friend

Minor: what if I have no ID

BAYNES: You can't get no money

BAYNES: Let have a secret love affair

Minor: Ahmm

BAYNES: You think about it, we meet at Kimj hotel where you swim at

Minor: When?

13

BAYNES: In May

BAYNES: Tell no one about this

BAYNES: You get money each month; You don't abuse it

BAYNES: You do as I say; everything I say

Minor: Trust me, Yessss

Minor: (Sends BAYNES four images that depict two clothed minor females).

BAYNES: no smile

BAYNES: why are you not with him then loving him as a bff

Minor: I'm with him tomorrow

BAYNES: send me real sexy pic show your love to him

Minor: Tomorrow

BAYNES: He touched your body but not getting back

BAYNES: Touching most have to pay to touch you that not free.  That call support

BAYNES: (Sends an image depicting a new cell phone in a box)

Minor: What is that?

BAYNES: phone..your boyfriend can't give to you to buy it

Minor: (Sends BAYNES three images that all depict the same young looking female's face).

BAYNES: he make you cry not me or anyone

Minor: Sorry

BAYNES: prove it

Minor: Yahh I will

BAYNES: When you prove it in person with me alone then you get whatever

BAYNES: Give more of yourself back you got lots back..Show more give more

BAYNES: Start showing, Short pant; No Short pant; no top; you get more

Minor: (Sends five images that depict the same young female clothed)

BAYNES:  Take off your clothes now, send

Minor: (Sends an image that depicts the same young female, dressed in white shorts and a

 multicolored half shirt that exposes her stomach area.)

BAYNES: You not showing much of anything, you got the tool use it..men give to see that body you got; that a tool

Minor: ah

BAYNES: take it all off and show; but you shy

Minor:  (Sends three images that depict the same young female, wearing shorts and a striped shirt).

BAYNES: can I see less cloth on; damn you sexy hot

Minor: Yahhh

BAYNES: that I love to see more off

BAYNES: if you not show what I ask for then you can't get what you want

BAYNES: You got what I want, I got what you need

BAYNES: ……So we have a date to meet in person. Private then you keep your promise.

BAYNES: Let me see that pic in sexy short; real sexy; show all of just you

18.     As stated above, based upon the information provided to NCMEC by Facebook, which was subsequently provided to law enforcement, the date of birth provided by the Minor when registering her Facebook account was 2003.  Therefore, she was only 16 years old when

15

BAYNES was communicating with her, and requesting her to send him sexually explicit pictures.

19.     On or about December 22, 2019 and continuing through on or about December 23, 2019, BAYNES using the Facebook account Bayn Ren (Facebook user ID 10004351476006) engaged in a chat conversation with Jonathan Renell Bañas Tarnate (100028079193720).  An excerpt of this exchange reads as follows:

> BAYNES: She got no ID
>
> Bañas: My mother coming here tomorrow uncle
>
> BAYNES: You want her to pick it up
>
> Bañas: You Uncle if you want but she ask for who's the money, For what I do to money
>
> BAYNES: She have no right to ask you who the money for
>
> Bañas: But for DXXXXX (referring to the minor female described above) money?
>
> BAYNES: You need to think about your business; In helping dXXXXX with my money
>
> BAYNES: (Sends confirmation of sending $205 USD to Merlyn Banas Tarnate – including the Tracking # (MTCN): 220 415 7717)
>
> BAYNES: give dXXXXX 5 k give your mother 1 k nono get 3 k give shanley 700 for Christmas
>
> BAYNES: Samantha Bulalaque Ralla; Hide and give dXXXXX the money so with every one.

20.     On or about February 25, 2020, and continuing through on or about March 4, 2020, BAYNES, using the Facebook account Bayn Ren, exchanged a series of messages with Facebook user ID 100043514760006.  An excerpt of this exchange reads as follows:

16

Minor: they said 18

BAYNES: I were send to alexa she were 17

Minor: Yes cause they need a valid id other than school id

BAYNES: you have a valid school id

Minor: They don't accept ID

BAYNES: If you want to get spoil get one

Minor: I can't get one right now..I'm not yet legal

Minor: I'm 17

BAYNES: alexa were 17; 16 when I meet her

Minor: You meet me 16, I'm 2003 (believed to be referring to the year of her birth)

21.     On or about June 4, 2018, and continuing through on or about July 30, 2018, BAYNES, using the Facebook account Valentine Bay, exchanged messages with Facebook user ID 100015254346815.  A portion of this Facebook conversation follows:

BAYNES: you in mountain

Minor: In school

Minor: What are you doing?

BAYNES: am thinking about you

BAYNES: why you tell everyone you got a new phone, you talk to much

BAYNES: for 13 old you dad or mom not buy it why talk so much, wby be so dumb

Minor: Okie, your very kind..because you gave me a phone

BAYNES: I know you have no money

Minor: yah I'm poor

17

BAYNES: how old are you now

BAYNES: you have to keep a secret

Minor: Okie

BAYNES: so you 14 now

BAYNES: so why do you post so many pic with your fake friends then, you not took any pic with me while am there and post it

Minor: That my classmate

BAYNES: so they classmate what have they done for you

BAYNES: my plan for you we have to spend more time

Minor: okie

BAYNES: when I visit you spend more time with me alone, no question asked

Minor: Okie

BAYNES: can you handle that; it our secret

Minor: Okie

Minor: what are you doing??

BAYNES: thinking about you; you sexy

BAYNES: where my sexy pic

BAYNES: where my pic; you say later; why I have to wait

BAYNES: if you don't have time for me I go to dXXXXX (referring to the minor described in the paragraphs above); she can be my girl

Minor: no

BAYNES: I can spoil her if you have school

22.    On or about September 1, 2019, and continuing through on or about September 9,

18

2019, BAYNES, using the Facebook account Valentine Bay, exchanged messages with

Facebook user ID 100041051533839.  A portion of this Facebook chat reads as follows:

BAYNES: let chat and know more then; you shy

BAYNES:  (Sends an image to the minor.  This image contains a cartoon that depicts an adult male engaging in oral sex with an adult female).

BAYNES: There are all types of masters which one do you seek

Minor: Hmmm, who would make me a filipina hooker

BAYNES: why you want to be that for; no life in that

Minor: What else

BAYNES: get bf; let chat more

Minor: ok

BAYNES: how old are you for real, real age

Minor: 15

BAYNES: what your parents say you want to be a hooker

Minor: They don't know

BAYNES: you live in manila[10]

Minor: No; Bicol.[11]

BAYNES: tell me a lot more about yourself; your real name and pic; show me

Minor: Yes this my real name and pic

BAYNES: send me your new pic of yourself

---

[10] Manila is the capitol city of the Philippines.

[11] Bicol is a region in the Philippines.

BAYNES: you not looking for a master; what you really looking for

Minor: Master

BAYNES: am the one who can teach you and spoil you with riches

23.　　On or about June 9, 2019, and continuing through on or about October 13, 2019, BAYNES, using the Facebook account Valen Bayn, exchanged messages with Facebook user Veliganilao Jel (100001791598735).  During your affiant's review of information provided by Facebook, Veliganialo Jel has been identified as Jely Veliganilao Tresvalles.  The Facebook user Veliganilao Jel (100001791598735) sends BAYNES several images of herself, medical documents, and images of her children.  Jely Veliganilao Tresvalles is also listed on records provided by Western Union as a receiver of funds sent by BAYNES.  On these Western Union records, Jely Veliganilao Tresvalles provides her date of birth, address, driver's license number, and telephone number.  A portion of this Facebook chat conversation reads as follows:

Veliganilao:  I'm so very sorry val I try but she scared and shy to meet you.

BAYNES: She is 17 old why and shy

Veliganilao: how any years u friend alexa and how much you give to support her

BAYNES: One year support, I gave to buy clothes food for birthday when ever she ask for money I send to her

Veliganilao: yes I say all.. I meet you in person an lunch and I also married

BAYNES: Like 5K to 10K at times

BAYNES: I know she young lady; she beautiful lady; why be scared and shy; it ok to tell her it ok

Veliganilao: I chat her to talk to you and explain to you she want

BAYNES: I meet her when she 16 old so I know her; All her friends want to meet me but not her, why

Veliganilao: Oh really she meet you at 16yrs old ohh…why she did not meet you again

BAYNES: I say I try to come back in September again to see jelly or meet her if she still scared

Veliganilao: I try my best to convince

Veliganilao: (Sends an image to BAYNES, via Facebook, that appears to be a screen capture from BAYNES' Facebook account.  This image depicts a young looking female).

BAYNES: Rxxxxx

Veliganilao: beautiful and sexy and pretty you don't like rxxxx

BAYNES: (Sends VELIGANILAO an image that depicts two young looking females sitting  next to each other).

BAYNES: In blue Jxxxxx in gray

Veliganilao: Jxxxxx is pretty and sexy and beautiful

BAYNES: (Sends Veliganilao an image that depicts a young looking female.  This image depicts the young looking female up close, and she appears to be sitting in a vehicle)

BAYNES: Kxxxx

BAYNES: (Sends Veliganilao an image that depicts a young looking female, dressed only in a bra and jean shorts)

BAYNES: Jxxxxxx

Veliganilao: wow…beautiful and sexy

Veliganilao: nude pictures

BAYNES: Kxxxx pictures, nude pictures

Veliganilao: yes same Jxxxxxx

21

BAYNES: (Sends Veliganilao an image that depicts a young looking female. This female is fully nude. She is positioned in such a way, and the camera is focused in such a way that her genitals or pubic area is visible and appears to be the focal point of the images)[12]

Veliganilao: how much you give kxxxx..do you meet in person

BAYNES: JXXXXXXXX MXXXX PXXXXXX (Believed to be the minor's full, legal name).

BAYNES: (Sends Veliganilao an image that depicts a young looking female). This female is standing-up and wearing a red dress)

BAYNES: she 17

Veliganilao: okay what did you say to her you help them…

BAYNES: say to who

Veliganilao: alexa

BAYNES: I rather spend money on a new watch then to help her or anyone

Veliganilao: wow beautiful and sexy and young

BAYNES: she is high school

BAYNES: she been talk to me a few day now

BAYNES: lives in CXXXXXXX, Philippines

Veliganilao: she is very young..and sexy single

BAYNES: she want to have boyfriend who can satisfy my needs hehe

Veliganilao: you like her?

---

[12] In total, BAYNES sent Veliganilao, via Facebook messenger, a total of 10 images depicting this same young looking female, who is believed to be a minor. The minor is fully nude in each of these images. Your affiant believes that this individual is a minor not only due to her youthful appearance, but after reviewing dozens of chats in BAYNS's multiple facebook accounts in which BAYNES describes this minor; the fact that he met her when she was only 13 years old; that she is currently in school and under the age of 18.

22

BAYNES: she 17 old, you ask stupid question some time

As the message exchange continues:

Veliganilao: you have so many collection pictures nude you have

Veliganilao: what is the real name of your brother

BAYNES: glen baynes

24.     On or about February 25, 2020, and continuing through on or about March 8, 2020, BAYNES, using the Facebook account Bayn Ren, exchanged messages with Facebook user ID 100031560711958.  An excerpt from this exchange reads as follows:

BAYNES: I like for you to be more sexier

BAYNES: I can teach you to be sexy…but what will your parents say

BAYNES: I have to find her pic; when she turn 17

BAYNES: ……Alexa XXX XXXXXXXX.

BAYNES: She got 10K for her 16 birthday

BAYNES: when do you plan to open and set more sexier

Minor: I don't know; try

BAYNES: Get your sexy short and top on…and send the pic for me

Minor: right now? Why

BAYNES: You keep you promise not time for school yet

BAYNES: …get sexy you can do it

Minor: sorry im not confident enough

BAYNES: Go to WU (believed to be referring to Western Union) ask the age limit on picking up money

23

Minor: ok…they said 18

BAYNES: I were send to alexa she were 17

Minor: It changed, they need a valid ID other than school ID

BAYNES: If you want to get spoil get one

Minor: I'm not yet legal

BAYNES: you hot and so sexy; you do not look your age

BAYNES: alexa were 17; 16 when I meet her

Minor: You met me 16, im 2003 (believed to be referring to the year of her birth)

BAYNES: I meet alexa at 16 to in 2017 she now 18

BAYNES: you don't want to get sexy underwear too

Minor: I don't want

BAYNES: buy a sexy swimsuit two piece take a nice picture in it

Minor: Thank you. I have received the money

BAYNES: you owe me big

25.     In April 2020, pursuant to a Grand Jury subpoena, your affiant received

information from Western Union.  According to the information provided by Western Union,

which your affiant has reviewed, on or about November 26, 2018, BAYNES, using the address

1300 Neal Street NE Washington, DC[13] and the date of birth 02/14/1953 sent Alexa XXX

---

[13] Information received from Western Union pursuant to legal process documents financial transactions transferred by Baynes to several individuals in the Philippines.  The addresses 1331 Neal Street NE Washington, DC (Subject residence) and 1300 Neal Street NE Washington, DC are both listed for a portion of Baynes' Western Union financial transactions.  The 1300 Neal Street NE Washington, DC is listed for the financial transaction discussed in this paragraph.  The credit card ending in "16405" is the only method of payment to finance Baynes' Western Union

XXXXXXXX, who is referenced in the above-mentioned message exchange, $125.00 United States currency via Western Union.  The Western Union location listed for the receiver of these funds is District II, San Miguel, Philippines.  The transaction amount in Philippine currency is 6222.63.

26.     During your affiant's review of various messages contained in the Facebook account Valentine Bay, your affiant viewed numerous conversations between BAYNES and the Facebook user Glen Baynes.  During these Facebook message exchanges, BAYNES refers to Glen Baynes as "brother".  BAYNES and Glen Baynes also discuss growing up together and other members of their family.

### IDENTIFICATION OF RENNIE VALENTINE BAYNES

27.     Pursuant to an administrative subpoena, Facebook provided the following information about Facebook accounts Bayn Ren, Valentine Baynes, and rbaynes:

Rbaynes (1610705142) Created on 11/01/2008
Rennie.bayn (100005770035992) Created on 11/05/2019
Valen.bay (100006770035992) Created on 06/21/2014

28.     Furthermore, the cellular telephone number 202-779-4270 was the registered

---

financial transactions.  This investigation has revealed that the credit card used by Baynes is issued by TD Bank.  Information provided by TD Bank pursuant to legal process, revealed that Baynes is the card holder for the referenced credit card account and the billing address is 1331 Neal Street NE Washington, DC.  A search of the District of Columbia Office of Tax and Revenue database revealed that there are no recorded properties associated with 1300 Neal Street NE Washington, DC.  It is unknown why Western Union lists 1300 Neal Street NE Washington, DC as associated with a portion of Baynes' financial transfers.  Your affiant submits for the reasons listed in this footnote and the information contained within this Affidavit, Baynes and the evidence sought by this search and seizure warrant will be located within 1331 Neal Street NE Washington, DC.

phone number for the Facebook account: rennie.bayn (100005770035992).  The e-mail address baynesv14@gmail.com was the e-mail address provided by the user of the Facebook account Rbaynes (1610705142) when registering the account.

29.     On or about April 18, 2020, pursuant to legal process, T-Mobile provided the following subscriber information for telephone number 202-779-4270:  The subscriber listed for this telephone number is Valentine R. Baynes.  The billing address is the address for the Subject Premises.

30.     The Facebook account 100005770035992 (Valen Bayn ) listed the Gmail address baynes02v@gmail.com as part of the account's contact information. In or about August 2020, your affiant received information from Google, LLC pursuant to legal process.  Google, LLC provided subscriber information and IP login information associated with the Gmail account baynes02v@gmail.com.  The name associated with this account is Valen Bay.  According to this information, the only IP address that was used to access the baynes02v@gmail.com account, between November 9, 2019 and June 26, 2020, is 69.250.207.97.  The name listed for this account is Valen Bay.

31.     These Facebook accounts were repeatedly accessed from IP address: 69.250.207.97.  This is the same IP address that was used to repeatedly access the Gmail account baynes02v@gmail.com, as detailed above. Using publicly available databases, your affiant conducted a search of this IP address to determine which Internet Service Provider ("ISP") owns this IP address.  This search revealed that the listed IP address is registered to Comcast Communications and that it is geolocated to Washington, D.C.

32.     Pursuant to legal process, Comcast provided the following subscriber information

for the above-mentioned IP address:  Subscriber:  Reenie Baynes.  Service address:  1331 Neal

Street NE Washington, D.C 20002 (the Subject Premises).  One of the listed e-mail addresses on

this account is rennie1331@comcast.net.

33.      In or about April 2020, using a database available to law enforcement, your

affiant learned that an individual named Rennie Valentine Baynes is associated with the address

belonging to the Subject Premises.

34.      In or about April 2020, your affiant conducted a search of databases maintained

by the Department of Homeland Security. This search revealed that BAYNES, a United States

Citizen, traveled from the United States to the Philippines, on May 15, 2019, via Hong Kong.

BAYES returned to the United States on June 15, 2019.  Based upon the information obtained

during this ongoing investigation, and a review of the Facebook messages as detailed above, this

foreign travel information corroborates the fact that BAYNES met a minor female in the

Philippines in May of 2019, and that he gave this minor money.

35.      In April 2020, your affiant viewed an application for a United States passport

filed by BAYNES with the United States Government on or about December 27, 2011.  In this

document, BAYNES provided the e-mail address rennie1331@comcast.net and listed his

mailing address as the address for the Subject Premises.

36.      On July 28, 2020, your affiant received information from the U.S. Postal Service.

that BAYNES is currently receiving mail at the Subject Premises.

37.      On May 1, 2020, your affiant reviewed information maintained by the  District of

Columbia Department of Motor Vehicles.  According to this information, BAYNES owns a 2015

Audi SUV and the Subject Premises is the registered address for this vehicle.  Furthermore,

BAYNES was issued a driver's license (2063595) in the District of Columbia. The Subject Premises is the listed address on this driver's license.

38.   In late July of 2020, a check of records maintained by the District of Columbia, Office of Tax and Revenue revealed that Reenie Valentine BAYNES owns the following property:  1331 Neal Street NE Washington, DC 20002 (the Subject Premises). The description of this property is a two-story residential single-family row house with four bedrooms and two bathrooms.

## TECHNICAL TERMS

39.   Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.   "Digital device," as used herein, includes the following three terms and their respective definitions:

1)   A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1).  Computers are physical units of equipment that perform information processing using a binary system to represent information.  Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)   "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical,

and magnetic digital storage devices.  Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)     "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.     "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking,

sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

c.      A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen.  Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise.  Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

d.      A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations.  Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation.  The GPS consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

f.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

g.      Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet.  An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.      The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the

31

Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

          i.      "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber.  By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

          j.      A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

          k.      A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.  The router also distributes to the relevant client inbound traffic arriving from the Internet.  A router usually retains logs for any devices using that router for Internet connectivity.  Routers, in turn, are typically connected to a modem.

l.      "Domain Name" means the common, easy-to-remember names associated with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level delimited by a period.  Each level, read backwards – from right to left – further identifies parts of an organization.  Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations.  Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice.  Additional levels may exist as needed until each machine is uniquely identifiable.  For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

n.      "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet.  In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software.  A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network.  A P2P file transfer is assisted by reference to the IP addresses of computers on the network:  an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers.   One aspect of P2P file sharing is that multiple files may be downloaded at

the same time.  Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

      i.     When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software. The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

      ii.     Third party software is available to identify the IP address of a P2P computer that is sending a file.  Such software monitors and logs Internet and local network traffic.

      o.     "VPN" means a virtual private network.  A VPN extends a private network across public networks like the Internet.  It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network.  This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two.  The VPN connection across the Internet is technically a wide area network (WAN) link between the sites.  From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network."  The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

      p.     "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption

scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an encryption key, which specifies how the message is to be encoded.  Any unintended party that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

q.      "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems.  It can appear in the form of code, scripts, active content, and other software.  Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

40.      As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found on the PREMISES, in whatever form they are found.  One form in which such items might be found is data stored on one or more digital devices.  Such devices are defined above and include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media,

35

such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Thus, the warrant applied for would authorize the seizure of digital devices or, potentially, the copying of stored information, all under Rule 41(e)(2)(B). Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that, if digital devices are found on the PREMISES, there is probable cause to believe that the items described in Attachment B will be stored in the Device(s) for at least the following reasons:

a.      Individuals who engage in criminal activity, including the sexual exploitation of children and the distribution and receipt of child pornography, using the Internet, commonly do so using small, hand-held, mobile computing devices. These devices are commonly kept on or near their user. From my experience, these items are routinely discovered during search warrants executed on the user's residence. Furthermore, these individuals often use digital devices, as defined above, to access websites to facilitate their illegal activity; to communicate with co-conspirators online; to locate and communicate with minor victims; to store documents, records, and images relating to their illegal activities - which can include logs and records of online chats; email correspondence; text messages; contact information belonging to co-conspirators or minor victims; identifiers for social media accounts; financial information, including bank account numbers and wire transfer receipts.

b.      Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to

that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

        c.     Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

        41.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes

described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

        a.      Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the

times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.       Forensic evidence on a digital device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.       A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.       The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices

behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e.     Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

      f.     I know that when an individual uses a digital device to engage in the sexual exploitation of children and/or to distribute or receive child pornography, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The digital device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

     42.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.      Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise.  As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else

to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

        d.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.  Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.  Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format.  Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography, a digital device user can conceal

text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

        e.     Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

f.    Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.  Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

43.    The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the premises.

a.    Therefore, in searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

1.    Upon securing the PREMISES, law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, seize any digital devices (that is, the Device(s)), within the scope of this warrant as defined above, deemed capable of containing the information, records, or evidence described in Attachment B and transport these items to an appropriate law enforcement laboratory or similar facility for review.  For all the reasons described above, it would not be feasible to conduct a complete, safe, and appropriate search of any such digital devices at the PREMISES.  The digital devices, and/or any digital images thereof created by law enforcement sometimes with the aid of a technical expert, in an appropriate

44

setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

2.      The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

3.      In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the seized digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

**BIOMETRIC ACCESS TO DEVICE(S)**

45

44.     This warrant permits law enforcement agents to obtain from the person of Rennie Valentine Baynes (but not any other individuals present at the PREMISES at the time of execution of the warrant) the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any Device(s) requiring such biometic access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the aforementioned person(s)' physical biometric characteristics will unlock the Device(s).  The grounds for this request are as follows:

45.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint scanners, facial recognition features, and iris recognition features.  Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

46.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device.  The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

46

47.     If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face.  For example, this feature is available on certain Android devices and is called "Trusted Face."  During the Trusted Face registration process, the user holds the device in front of his or her face.  The device's front-facing camera then analyzes and records data based on the user's facial characteristics.  The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers (such as Apple's "Face ID") have different names but operate similarly to Trusted Face.

48.     If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises.  For example, on certain Microsoft devices, this feature is called "Windows Hello."  During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face.  The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises.  The device can then be unlocked if the infrared-sensitive camera detects the registered irises.  Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

49.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.  This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

47

50.     As discussed in this Affidavit, your Affiant has reason to believe that one or more digital devices, the Device(s), will be found during the search.  The passcode or password that would unlock the Device(s) subject to search under this warrant currently is not known to law enforcement.  Thus, law enforcement personnel may not otherwise be able to access the data contained within the Device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

51.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled.  This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time.  For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days.  Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions.  Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

52.     Due to the foregoing, if law enforcement personnel encounter any Device(s) that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to obtain from the aforementioned person(s) the display of any physical biometric characteristics (such as

fingerprint/thumbprint or facial characteristics) necessary to unlock any Device(s), including to (1) press or swipe the fingers (including thumbs) of the aforementioned person(s) to the fingerprint scanner of the Device(s) found at the PREMISES; (2) hold the Device(s) found at the PREMISES in front of the face of the aforementioned person(s) to activate the facial recognition feature; and/or (3) hold the Device(s) found at the PREMISES in front of the face of the aforementioned person(s) to activate the iris recognition feature, for the purpose of attempting to unlock the Device(s) in order to search the contents as authorized by this warrant.

53.     The proposed warrant does not authorize law enforcement to require that the aforementioned person(s) state or otherwise provide the password, or identify specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the Device(s).  Nor does the proposed warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel the aforementioned person(s) to state or otherwise provide that information.   However, the voluntary disclosure of such information by the aforementioned person(s) would be permitted under the proposed warrant.  To avoid confusion on that point, if agents in executing the warrant ask any of the aforementioned person(s) for the password to any Device(s), or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks any Device(s), the agents will not state or otherwise imply that the warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.

## CONCLUSION

54.     Based on the foregoing, there is probable cause to believe that the federal

criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B, are located at the location described in Attachment A.  I respectfully request that this Court issue a search warrant for the locations described in Attachment A, authorizing the seizure and search of the items described in Attachment B.

Respectfully submitted,

_____
Raymond Abruzzese
Special Agent
Homeland Security Investigations

Subscribed and sworn telephonically pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on this 2nd  day of October, 2020.

_____
THE HONORABLE G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE